IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
LEWIS T. BABCOCK, JUDGE

Civil Case No.  11-cv-03131-LTB

LEO S. GOMEZ,

        Plaintiff,

v.

MICHAEL J. ASTRUE, Commissioner of Social Security,

        Defendant.

_____

ORDER
_____

Plaintiff Leo S. Gomez appeals from the Social Security Administration ("SSA") Commissioner's (the "Commissioner") final decision denying his application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"), filed pursuant to Titles II and XVI of the Social Security Act (the "Act"), 42 U.S.C. §§ 401-433, 1381-1383c. Jurisdiction is proper under 42 U.S.C. § 405(g). Oral argument will not materially aid in resolving this appeal. After considering the parties' arguments and the administrative record, for the reasons below, I AFFIRM the Commissioner's final order.

## I.  STATEMENT OF THE CASE

Plaintiff seeks judicial review of the Commissioner's decision denying his September 5, 2008, application for DIB and SSI, alleging an inability to work beginning on April 19, 2007, due to disability. [Administrative Record ("AR") 45-48] After his application was denied, Plaintiff requested a hearing before an administrative law judge (the "ALJ"). An ALJ subsequently conducted a hearing on July 8, 2010, and issued a written ruling on August 12, 2010, denying

Plaintiff's application on the basis that he was not disabled between the date he alleges that he became disabled and the date the ALJ rendered his decision. [AR 13-24]  On October 6, 2011, the SSA Appeals Council (the "Appeals Council") denied Plaintiff's administrative request for reconsideration, making the denial final for the purpose of judicial review. [AR 1]  Plaintiff timely filed his complaint with this Court seeking review of the Commissioner's final decision.

## II. FACTS

### A.
### General Background

Plaintiff was born on May 9, 1957, was 49 on his alleged onset date, and was 53 on the date of the ALJ's decision. [AR 22] He has a high school education and previously worked as a stock clerk. [AR 23] He alleged an inability to work due to arthritis in both knees and depression.

In January 2005, Plaintiff sprained his right knee. [AR 232] No permanent impairment was assessed, and he was released to full duty work on April 22, 2005.

### B.
### Evidence Before the ALJ

Over three years later, and approximately sixteen months after his alleged onset date, Plaintiff visited the Pueblo Community Health Center ("PCHC") on August 19, 2008, complaining of bilateral knee pain. [AR 190] He saw Kristen Hurley, P.A.-C.  Plaintiff described that his knee pain began in "the last few months." [AR 190] He stated that about one year prior he sustained an injury to his right knee, that it still bothered him some, but that he never saw a doctor for it other than a worker's compensation doctor. [AR 190] He reported that it was his left knee that was really hurting him, particularly if he kept it bent too long. [AR 190] Plaintiff said that he could not stand on it for long periods of time and that it felt "kind of 'shaky.' " [AR 190] He denied any trauma or

2

repetitive activity as a possible cause. [AR 190] He also told Ms. Hurley that he had been depressed since losing his job a year earlier. Ms. Hurley found no laxity of ligaments or effusion in either knee and pain in the left knee with range of motion. [AR 189-90] She diagnosed Plaintiff with bilateral knee pain, worse in the left, ordered an x-ray, and prescribed wraps, ice, elevation, and Tylenol. [AR 189] She also prescribed Zoloft for depression and anxiety and referred Plaintiff for mental health treatment. [AR 189]

On September 2, 2008, Plaintiff saw Ms. Hurley for a follow-up visit. [AR 188] Ms. Hurley's review of Plantiff's x-rays revealed mild-to-moderate joint-space narrowing and osteophytes in each patella. [AR 188] Ms. Hurley recommended glucosamine or Tylenol. [AR 188] Plaintiff reported no change in his depressive symptoms with Zoloft. [AR 188] Ms. Hurley's notes from that day reflect that Plaintiff had an elevated triglyceride level. [AR 188]

On September 19, 2008, Plaintiff saw Margaret Bennett, R.N., to discuss a diet that would help him lower his triglyceride level and improve his cholesterol. [AR 187]   Ms. Bennett recommended certain changes to Plaintiff's diet and that he begin walking 1.5 miles three to four times per week. [AR 187]  She noted that even though Plaintiff stated he was frequently depressed, "he smiles easily and seems to have a sense of humor." [AR 187]

Plaintiff saw Ms. Hurley for another follow-up visit for his knee pain on September 22, 2008. [AR 185] Plaintiff reported no change in his knee pain or depression and questioned whether the Zoloft was having any effect. [AR 185] Ms. Hurley increased his dosage of Zoloft and referred him for orthopaedic evaluation. [AR185] When he returned for another follow-up on October 2, 2008, Plaintiff told Ms. Hurley that his depression was "not doing a whole lot better." [AR 184]

On October 10, 2008, Lee Fonseca, N.P., examined Plaintiff per Ms. Hurley's referral. [AR 191] Plaintiff reported that he had been having knee pain for roughly one year and that both knees ached. [AR 191] He further explained that he had not had any treatment therapy, injections, or surgeries for his knee pain. [AR 191] He also told Ms. Fonseca that he was unemployed and not very active. [AR 191] Ms. Fonseca's physical examination of Plaintiff revealed pain in the knees but no swelling or bruising in his knees, no signs of acute effusion, "well-preserved" range of motion in both knees, a normal station and gait, stability in both knees in response to varus and valgus stress tests. [AR 191] Ms. Fonseca also reviewed Plaintiff's x-rays. From all of this, her impression was "mild to minimally degenerative osteoarthritic changes to both knee joints." [AR 191] She administered cortisone injections in both knees and recommended Tylenol or nonsteroidal anti-inflammatory medication for pain relief. [AR 191-92]

Plaintiff returned to PCHC for a follow-up visit with Ms. Hurley on October 23, 2008. [AR 183] He reported that he had been walking as much as possible but that he is limited due to his knee pain. [AR 183] He told Ms. Hurley that the cortisone injections administered by Ms. Fonseca had not provided much relief. [AR 183] He did, however, report that his depression was "somewhat better." [AR 183]

In November 2008, James Wanstrath, Ph.D., a State agency psychologist, reviewed the record and completed a psychiatric review of Plaintiff. He concluded that Plaintiff did not have a "severe" mental impairment as defined by the Act.[AR 209-223] He found that Plaintiff's depression caused only mild restrictions in activities of daily living, social functioning, and concentration, and no episodes of decompensation. [AR 220] Barbara Martinez, Ph.D., a medical consultant, reviewed and affirmed these findings in December 2008. [AR 229-30]

4

Also in November 2008, a State agency single decision maker, Robert Robbins, reviewed the record and assessed Plaintiff's residual functional capacity ("RFC"). [AR 201-08] Mr. Robbins opined that Plaintiff could lift 50 pounds occasionally and 25 pounds frequently; could stand and/or walk for about six hours and sit for about six hours in an eight-hour workday; had no upper or lower extremity push and/or pull restrictions; could occasionally climb ramps and stairs, stoop, kneel, crouch, and crawl; and could never climb ladders or scaffolds. [AR 201-08] Kasiel Steinhardt, M.D., a State agency doctor, reviewed and affirmed this assessment in December 2008. [AR227-28]

Plaintiff saw Ms. Hurley again on December 16, 2008, for his depression. [AR 235] He told her that he was having "good days and bad days" and that "[s]ometimes he just wants to stay in bed." [AR 235] Ms. Hurley increased his Zoloft dosage from 100 to 150 milligrams [AR 235] Plaintiff saw Ms. Hurley again on January 27, 2009, and reported that he "seem[ed] to be doing better." [AR 234]

Just two days later, on January 29, 2009, Cynthia Jimenez, a licensed clinical social worker, completed a mental functional capacity evaluation concerning Plaintiff. [AR 257-58] She found that Plaintiff "ha[d] a [diagnoses] of major depression, recurrent, moderate," with symptoms that include fatigue, difficulty concentrating and planning, loss of interest, and difficulty trusting others. [AR 258] She assessed Plaintiff with slight to moderate limitations on his ability to understand and remember; slight to marked limitations on sustained concentration and persistence; none to marked limitations on his social interactions; and slight to marked limitations on his ability to adapt. [AR 257-58] She stated that Plaintiff would have to miss more than three days of work per month. [AR 258] Ms. Jimenez concluded that Plaintiff did not have the ability to perform certain work-related mental activities on a sustained basis (eight hours per day, five days per week, with normal breaks

every two hours). [AR 258]

During a March 30, 2009, follow-up visit with Ms. Hurley for his depression, Plaintiff stated he was "doing okay." [AR 233] Ms. Hurley noted in her observations that Plaintiff had "no apparent distress" and was "very pleasant." [AR 233] She further stated that Plaintiff "seem[ed] to be doing better on the increased dose of Zoloft 150 mg." [AR 233]

Plaintiff returned to PCHC for another follow-up with Ms. Hurley on June 29, 2009. [AR 249] That day Plaintiff reported that he did not think his depression was "getting much better" and complained of chronic knee pain that limited his activities. [AR 249] Ms. Hurley switched Plaintiff from Zoloft to Cymbalta. [AR 249] During another follow-up with Ms. Hurley in July 2009 Plaintiff reported no improvement in his knee pain and depression. [AR 248] Ms. Hurley encouraged Plaintiff to contact the department of vocational rehabilitation to find some employment other than his past work as a stock clerk because the lifting it required was too hard on his knees. [AR 247]

On October 14, 2009, Plaintiff saw Ms. Hurley to have his Cymbalta prescription refilled. [AR 246] He told Ms. Hurley that his depression was doing better, that his symptoms thereof were less severe, that Cymbalta "seem[ed] to help him a great amount of the time," but that he felt depressed about his knee condition. [AR 246] He denied any thoughts of hurting himself or others. [AR 246] He also explained that he had recently twisted his right knee. [AR 246] Ms. Hurley noted that Plaintiff favored his left leg when walking and that his right knee was positive for ecchymosis, had some ballottable effusion, and tenderness. [AR 246] She diagnosed Plaintiff with moderately controlled depression and knee pain with possible derangement. [AR 245] Ms. Hurley ordered an MRI scan of Plaintiff's right knee, and it showed a torn meniscus, soft tissue swelling, and osteoarthritis. [AR 255]

During another followup visit with Ms. Hurley for his knee pain on November 16, 2009, Ms. Hurley noted that Plaintiff walked with a very faint limp and that his depression had improved with Cymbalta. [AR 244] In December 2009, Plaintiff reported to Ms. Hurley that an orthopedist had told him that surgery would not help his knee. [AR 243]

On April 1, 2010, Plaintiff told Ms. Hurley that he was "doing okay" with respect to his depression and that he had not been walking much because of knee pain. [AR 239] Ms. Hurley noted that Plaintiff had seen an orthopedist and that the orthopedist did not think Plaintiff's case was advanced enough for surgery. [AR 239] She encouraged Plaintiff to walk in order to lose weight and to take Tylenol or Advil in addition to the Vicodin she prescribed. [AR 239]

On May 3, 2010, Plaintiff visited Ms. Hurley for his depression. [AR 238] He reported that he was "doing about the same," did not want to see a counselor, and that he continued having difficulty exercising because of his knee pain. [AR 238]

## B.
## Evidence Submitted to the Appeals Council

After the ALJ issued his decision, Plaintiff submitted additional evidence to the Appeals Council with his request for review of the ALJ's decision. This evidence is summarized below.

On September 16, 2008, Plaintiff saw Ms. Jimenez, the licensed clinical social worker, for his depression. [AR 261-62] He told her that he had recently separated from his wife, that he was trying to work things out with her, and that he had felt depressed most of his life. [AR 261] He reported a felony conviction for sexual assault in 2009 and shared his concern that he felt that limited his employment options. [AR 262] Plaintiff stated that he was depressed and fearful, and he gave Ms. Jimenez a history of his current problems. [AR 261] Ms. Jimenez found Plaintiff had a depressed mood; restricted affect; intact memory; normal thought processes; no hallucinations; fair

judgment, insight, and social support; and good impulse control. [AR 262] Her initial diagnostic impression was that Plaintiff had major depression and a global assessment of functioning score ("GAF") of 45, which indicates serious symptoms or a serious impairment in social, occupational, or school functioning. [AR 262]

Ms. Jimenez's notes from a one hour meeting with Plaintiff on October 27, 2008, indicate that Plaintiff's behavior, cognition, and appearance were normal, but that his mood was depressed. [AR 279] Her notes from a meeting with Plaintiff on November 24, 2008, indicate the same. [AR 277] She noted that Plaintiff was very focused on financial issues and wanted to work. [AR 277]

In January 2009, Plaintiff reported to Ms. Jimenez that he was "feeling pretty good." [AR 272] Ms. Jimenez's notes state that Plaintiff's mood and affect was improving gradually and that he seemed much more self confidant. [AR 272] Plaintiff explained that the main concern that contributes to his mood is his lack of income. [AR 273] On February 5, 2009, after seeing Plaintiff for one hour two days before, Ms. Jimenez noted that Plaintiff appeared "the same as usual" and had "no significant changes in mood." [AR 271] She further noted that Plaintiff was functioning adequately at home and that he was very worried about finances and fixated on his felony and that it is going to prevent him from getting a job. [AR 271] Two weeks later, on February 18, 2009, Plaintiff told Ms. Jimenez he was feeling and doing "pretty well." [AR 270] Plaintiff also reported that he was functioning well and managing things well in his home. [AR 270] Ms. Jimenez observed that Plaintiff looked and sounded very well and noted signs of improvement. [AR 270]

During a 45-minute session on March 31, 2009, Plaintiff told Ms. Jimenez that he was "doing very well." [AR 269] Ms. Jimenez's notes from that session indicate that Plaintiff likewise "sounded very good," was smiling and laughing, and seemed to be feeling very good about himself.

[AR 269]  They also indicate that Plaintiff's depression was improving. [AR 269] Ms. Jimenez stated that she considered helping Plaintiff with his disability claim, but the claim "seems to be largely based on difficulty with his knees." [AR 269]

On April 15, 2009, Plaintiff saw Ms. Jimenez for a one hour session. [AR 268] Plaintiff reported that he was feeling "pretty well." [AR 268] Ms. Jimenez observed that Plaintiff's mood was stable and had improved. [AR 268] At his next session two weeks later, Plaintiff again reported feeling "pretty good." [AR 267] Ms. Jimenez again observed a stable and improved mood, and she noted Plaintiff' diagnosis of depression was improving. [AR 267] At that time she reduced the frequency of his counseling sessions from biweekly to monthly. [AR 268]

At his next session in May 2009, Plaintiff told Ms. Jimenez that he was doing "very, very well," that he does not feel depressed, and that he "really thinks his medications are helping him." [AR 266] In July 2009, Ms. Jimenez noted that Plaintiff's mood "dipped a little bit" and improved again in August 2009 when he expressed excitement about possibly doing some radio broadcasting with a nephew. [AR 264]

In September 2009, Plaintiff reported to Ms. Jimenez that he was "feeling really quite well" and was "very busy with doing some projects around his in-law's home including some painting." [AR 263] He also reported that he was helping transport his grandchildren to and from school and providing daycare for them and that he was traveling with his wife. [AR 263] Ms. Jimenez noted that Plaintiff's mood was "much improved" and terminated treatment. [AR 263]

Another piece of evidence concerns Ms. Hurley. On September 14, 2010, Ms. Hurley stated that she agreed with the mental impairments Ms. Jimenez found in her January 2009 report. [AR 282, 257-58] Ms. Hurley also stated that she diagnosed Plaintiff with bilateral knee pain caused by

degenerative osteoarthritis, that this condition limited the time he could stand/walk limited the time he could be on his feet to 30 minutes in an eight-hour work day.

### III. LAW

To qualify for DIB under section 216(i) and 223 of the Act, an individual must meet the insured status requirements of these sections, be under age 65, file an application for DIB for a period of disability, and be "disabled" as defined by the Act.  42 U.S.C. §§ 416(i), 423. An individual's eligibility for SSI payments for each month shall be determined on the basis of the individual's income, resources, and other relevant characteristics. 42 U.S.C. § 1382(c)(1).  In addition to being financially eligible, the individual must file an application for SSI and be considered "disabled" as defined by the Act. 42 U.S.C. § 1382.

A five-step sequential evaluation process is used to determine whether a claimant is disabled, which is generally defined in the Act as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(B); *see also Bowen v. Yuckert*, 482 U.S. 137, 137, 107 (1987).

Step One is whether the claimant is presently engaged in substantial gainful activity.  If he is, disability benefits are denied.  *See* 20 C.F.R. § 416.920.  Step Two is a determination of whether the claimant has a medically severe impairment or combination of impairments as governed by 20 C.F.R. § 416.920(c).  If the claimant is unable to show that his medical impairments would have more than a minimal effect on his ability to do basic work activities, he is not eligible for disability benefits.  Step Three determines whether the impairment is equivalent to one of a number of listed impairments deemed to be so severe as to preclude substantial gainful employment.  *See* 20 C.F.R.

§ 416.920(d).  If the impairment is not listed, he is not presumed to be conclusively disabled.

Before moving to Step Four, the ALJ must determine the claimant's RFC, which is the claimant's ability to do physical and mental work activities on a sustained basis despite impairments. *See* 20 C.F.R. § 404.1520(f), 416.920(f).  Step Four then requires the claimant to show that his impairment(s) and assessed RFC prevent him from performing his past work.  If the claimant is able to perform his previous work, the claimant is not disabled.  *See* 20 C.F.R. § 416.920(e) & (f). Finally, if the claimant establishes a *prima facie* case of disability based on the four steps discussed, the analysis proceeds to Step Five where the Commissioner has the burden of proving that the claimant has the RFC to perform other work in the national economy in view of his age, education, and work experience.  *See* 20 C.F.R. § 416.920(g).

## IV. ALJ's RULING

The ALJ ruled that Plaintiff met the insured status requirements of the Act through December 31, 2012.  [AR 14] Plaintiff therefore must establish disability on or before that date to be entitled to SSI and DIB.  [AR 12]

The ALJ found that Plaintiff had not engaged in substantial gainful activity since April 19, 2007, the alleged onset date (Step One).  [AR 18] Next, the ALJ determined that Plaintiff's only severe impairment was osteoarthritis bilateral knees (Step Two).  [AR 18] The ALJ determined that this impairment did not meet or medically equal a listed impairment (Step Three). [AR 20] The ALJ then assessed Plaintiff with the following RFC:

> the claimant  has the residual functional capacity to perform light work as defined by 20 CFR 404.1567(b) and 416.967(b) with the following limitations: claimant could perform semi-skilled work; could stand and/or walk for a total of four to six hours in an eight hour day, up to one hour at a time, after which he would need to sit for 15 minutes before resuming standing for another hour at a time; could sit for six hours in an eight hour day; could push and/or pull with his upper and lower

extremities within the exertional level; should not climb ladders, ropes or scaffolds; could occasionally climb ramps or stairs; could occasionally perform the postural activities of stooping, kneeling, crouching and crawling and should avoid concentrated exposure to extreme cold and hazards such as unprotected heights or unprotected running or operating machinery.

[AR 20] The ALJ then found that Plaintiff was incapable of performing past relevant work as a stock clerk (Step Four). [AR 21, 14] Considering Plaintiff's age, education, work experience, and assessed RFC, the ALJ found that Plaintiff could perform certain jobs that existed in significant numbers in the national economy (Step Five). [AR 23] These jobs were office helper, order clerk, and parking lot attendant. [AR 23] Consequently, the ALJ found that Plaintiff had not been disabled between his alleged onset date and the date of his decision. [AR 24]

## V. STANDARD OF REVIEW

My review is limited to whether the final decision is supported by substantial evidence in the record as a whole and whether the correct legal standards were applied. *Williamson v. Barnhart,* 350 F.3d 1097, 1098 (10th Cir. 2003); *White v. Barnhart,* 287 F.3d 903, 905 (10th Cir. 2001); *Qualls v. Apfel,* 206 F.3d 1368, 1371 (10th Cir. 2000). Thus, the function of my review is "to determine whether the findings of fact  . . . are based upon substantial evidence and inferences reasonably drawn therefrom; if they are so supported, they are conclusive upon [this] reviewing court and may not be disturbed." *Trujillo v. Richardson*, 429 F.2d 1149, 1150 (10th Cir. 1970). "Substantial evidence is more than a scintilla, but less than a preponderance; it is such evidence that a reasonable mind might accept to support the conclusion." *Campbell v. Bowen*, 822 F.2d 1518, 1521 (10th Cir. 1987) (*citing Richardson v. Paralyze*, 402 U.S. 389, 401 (1971)). I may not re-weigh the evidence or substitute my judgment for the ALJ's judgment. *See Casias v. Secretary of Health & Human Serve.,*933 F.2d 799, 800 (10th Cir. 1991); *Jozefowicz v. Heckler*, 811 F.2d 1352, 1357 (10th Cir.

12

1987). With regard to the application of the law, reversal may be appropriate when the Commissioner either applies an incorrect legal standard or fails to demonstrate reliance on the correct legal standards.  *See Winfrey v. Chater,* 92 F.3d 1017, 1019 (10th Cir. 1996).

## VI. ISSUES ON APPEAL

Plaintiff raises seven issues on appeal. I address them *seriatim*.

### A.
### The RFC Assessment

 Plaintiff's first issue concerns the ALJ's assessed RFC. As stated, the ALJ determined that the Plaintiff has the RFC to perform "light work," as defined by 20 C.F.R. § 404.1567(b) and 416.967(b), with the following limitations: he could perform semi-skilled work, could stand and/or walk for a total of four to six hours in an eight hour day, up to one hour at a time, after which he would need to sit for 15 minutes before resuming standing for another hour at a time; could sit for six hours in an eight hour day; could push and/or pull with his upper and lower extremities within the exertional level; should not climb ladders, ropes or scaffolds; could occasionally climb ramps or stairs; could occasionally perform the postural activities of stooping, kneeling, crouching and crawling and should avoid concentrated exposure to extreme cold and hazards such as unprotected heights or unprotected running or operating machinery. Plaintiff assails the RFC on two fronts.

### 1

The leading attack is that this RFC assessment was not based upon the correct legal standards because it did not express a finding as to Plaintiff's lifting capacity and because it did not do so before determining that Plaintiff could perform light work. I disagree.

Generally, "an RFC assessment must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis.... Only after

that may RFC be expressed in terms of the exertional levels of work" such as "light." *Ren v. Astrue*, 2009 WL 3497785, *5 (D. Colo. Oct. 29, 2009) (unpublished) (citing Social Security Ruling 96–8p, 1996 WL 374184, *1 (1996) ("SSR 96-8p")). This function-by-function assessment "requires the ALJ to address 'an individual's limitations and restrictions of physical strength and defines the individual's remaining abilities to perform each of seven strength demands: sitting, standing, walking, lifting, carrying, pushing, and pulling.' " *Id.* (quoting SSR 96-8p, 1996 WL 374184, *5). And " '[e]ach function must be considered separately. . .  even if the final RFC assessment will combine activities.' "  *Id.* (quoting SSR 96-8p, 1996 WL 374184, at *5).

The ALJ stated that Plaintiff could perform "light work" with additional, articulated restrictions addressing the strength demands. "Light work" is defined as work that

> *involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds*. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.

20 C.F.R. § 404.1567(b) (emphasis added).  The definition of "light work" combined with the additional specific limitations the ALJ articulated makes clear to me that the ALJ expressed a finding as to Plaintiff's ability to lift: he could lift 20 pounds at a time and could frequently lift objects weighing up to 10 pounds.  Stated differently, the ALJ did not express Plaintiff's entire RFC solely in terms of the exertional level of work, which is what SSR 96-8p instructs against.  The ALJ instead expressed Plaintiff's ability to lift by saying he could perform "light work."  He therefore comported with SSR 96-8p.

Furthermore, SSR 96-8p specifically notes that the function-by-function analysis is most relevant when an ALJ determines whether a claimant is able to perform past work at Step Four.  *See*

SSR 96-8p, 1996 WL 374184, at *5. Because the ALJ here found that the Plaintiff was *unable* to do past relevant work, "the function-by-function analysis is less critical." *Ren*, 2009 WL 3497785, at *6 (quoting SSR 96-8p, 1996 WL 374184, at *5).

Additionally, the ALJ's subsequent analysis discussed in detail the medical evidence relating to Plaintiff's ability to perform the seven strength demands. "This is adequate to meet the requirements of 96-8p." *Id.* And even if the ALJ erred by failing to include an explicit statement of Plaintiff's lifting and carrying capacities, in light of the rest of the RFC he articulated, his analysis, and my review of the record, that error is merely a technical error "minor enough not to undermine confidence in the determination of th[e] case." *See Gay v. Sullivan*, 986 F.2d 1336, 1341 n.3 (10th Cir. 1993). It is therefore harmless. *Allen v. Barnhart*, 357 F.3d 1140, 1145 (10th Cir. 2004).

For these reasons I reject Plaintiff's leading argument as to this issue.

**2**

Plaintiff secondly maintains that the ALJ's determination that he could stand and/or walk for a total of four to six hours in an eight-hour day precludes a finding that he could perform light work. I note that he does *not* contend that the finding is not supported by substantial evidence. I disagree with Plaintiff.

It is the case that "the *full* range of light work requires standing or walking, off an on, for a total of approximately 6 hours of an 8-hour workday." Social Security Ruling 83-10, 1983 WL 31251, *6 (1983) (emphasis added) ("SSR 83-10"). The ALJ, however, did not find that Plaintiff was capable of a "full" or "wide range" of light work. [AR 20] A claimant is capable of "light work" if he can lift no more than 20 pounds at a time and can "frequently" lift or carry objects weighing

up to 10 pounds. 20 C.F.R. § 404.1567(b) (emphasis added). Lifting or carrying requires being on one's feet. SSR 83-10, 1983 WL 31251, *6. "Frequently" means "occurring from one-third to two-thirds of the time." *Id.* Thus, a claimant is capable of light work–as compared to a "full range of light work"–if he can stand and/or walk for roughly 2.6 to 5.4 hours during an eight-hour workday (the products of eight hours times one third and two-thirds, respectively). The ALJ's finding that Plaintiff can stand and/or walk for a total of four to six hours is consonant with light work. (I note parenthetically that a claimant is also capable of light work if he can "sit[] most of the time with some pushing and pulling of arm or leg controls." *See* 20 C.F.R. § 404.1567(b); *see* SSR 83-10, 1983 WL 31251, *5-6. [*See* AR 20 (finding that Plaintiff could sit for six hours in an eight hour day and could push and/or pull with his upper and lower extremities within the exertional level)])

Plaintiff also asserts that the ALJ found that he must be able to alternate between sitting and standing and that this too precludes light work. Plaintiff is again mistaken. To be sure, the ALJ found that Plaintiff needs to be able to briefly sit down after walking or standing for an hour, but that does not preclude even a full range of light work, let alone light work. *See* SSR 83-10, 1983 WL 31251, at *6 ("[T]he full range of light work requires standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday. *Sitting may occur intermittently during the remaining time*.") (emphasis added). What the applicable ruling explains is that a claimant is not functionally capable of light work if he "may be able to sit for a time, but must then get up and stand or walk for awhile before returning to sitting." Security Ruling 83-12, 1983 WL 31253, *4 (1983) ("SSR 83-12"). The ALJ found no such restriction. [*See* AR 20]

Accordingly, I reject Plaintiff's second argument as to this issue.

16

**B.**
**Non-Application of Grid Rule 201.14**

Plaintiff argues that the ALJ erred by not applying Grid Rule 201.14. He submits that SSR 83-12 required the ALJ to apply Grid Rule 201.14. I disagree.

If a claimant makes a showing of disability preventing him from engaging in prior work activity, the burden shifts to the Secretary to show that the claimant retains the capacity to perform an alternative work activity and that this specific type of job exists in the national economy. *Frey v. Bowen*, 816 F.2d 508, 512 (10th Cir. 1987). The Secretary can often meet this burden by relying on the Medical Vocational Guidelines, 20 C.F.R. § 404, Subpt. P, App. 2 (the "Grid Rules"). *Frey*, 816 F.2d at 512.

> The grids consider a claimant's [RFC] to perform work (e.g., sedentary, light, medium or heavy) in relation to age, education, and work experience. A series of rules then set forth presumptions of disability or no disability, depending upon whether there are significant numbers of jobs in the national economy that a claimant with that particular configuration of characteristics can perform. When the claimant's individual characteristics as found by the ALJ coincide with one of the specific rules, that rule "directs a conclusion as to whether the individual is or is not disabled."

*Id.* (internal citations omitted).

SSR 83-12 "sets out the process of using the numbered rules in adjudicating those claims in which the exertional components of the RFC are less or greater than those of a specifically defined exertional range of work." *See* 1983 WL 31253, at *1. Light work was defined above. *See* 20 C.F.R. § 404.1567(b). By contrast, sedentary work

> involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

20 C.F.R. § 404.1567(a); SSR 83-10, 1983 WL 31251, *5 (" 'Occasionally' means occurring from very little up to one-third of the time. Since being on one's feet is required 'occasionally' at the sedentary level of exertion, periods of standing or walking should generally total no more than about 2 hours of an 8-hour workday, and sitting should generally total approximately 6 hours of an 8-hour workday.").  SSR 83-12 explicates certain considerations for when an exertional level falls between two rules that direct opposite conclusions. 1983 WL 31253, at *2.

Grid Rule 201.14 applies if (1) the claimant is limited to sedentary work; (2) is of "advanced age;" (3) has a high school education or more but that does not provide for direct entry into skilled work; and (4) has previous work experience with skilled or semi-skilled jobs but those skills are not transferable. *See* Grid Rule 201.14, 20 C.F.R. § 404, Subpt. P, App. 2 § 201.14.

Plaintiff does not contend that the ALJ's finding that he could stand and/or walk four to six hours is not supported by substantial evidence.  He instead insists that, at the least, this finding significantly reduced his ability to perform light work and made him capable of a little more than sedentary work–that is, the finding put him in between light and sedentary work. As discussed, this is not so. That finding fits squarely within with light work and exceeds that required for sedentary work. *See* Part VI.A.2; *compare* SSR 83-10, 1983 WL 31251, at *5 (requirements for sedentary work), *with id.* at *5 (requirements for light work).  Consequently, neither SSR 83-12 nor Grid Rule 201.14 applied. *See* SSR 83-12, 1983 WL 31253, at *1; *Channel v. Heckler*, 747 F.2d 577, 579 (10th Cir. 1984) ("Where any one of the findings of fact does not coincide with the corresponding criterion of a rule, the rule does not apply in that particular case and, accordingly, does not direct a conclusion of disabled or not disabled.' " (quoting and citing Grid Rule 200.00(a), 20 C.F.R. § 404, Subpt. P, App. 2 § 200.00(a))).  I therefore reject this argument.

**C.**
**Finding that Plaintiff Could Stand and/or Walk for a Range of Time**

Plaintiff's tertiary issue is that the ALJ's finding concerning his ability to stand and/or walk was impermissibly imprecise.  Specifically, he argues that the "four to six hours" restriction is vague and ambiguous. Plaintiff, however, offers no authority supporting his assertion that a two-hour range is grounds for reversal.  Nor does he offer authority mandating that an ALJ state the exact number of hours a claimant could walk and/or stand. To the contrary, this Court and others have affirmed an ALJ's denial of benefits to claimants who were found to be able to stand/walk and/or sit for a range of hours. *See, e.g.*, *Redding v. Astrue*, 2009 WL 1392063 (D. Colo. May 18, 2009) (unpublished); *Martinez v. Astrue*, 2010 WL 1753799 (D. Colo. Apr. 29, 2010) (unpublished); *see also Lawrence v. Astrue*, 337 Fed. App'x 579 (7th Cir. 2009) (unpublished); *McDonald v. Astrue*, 2012 WL 1029951 (D. Or. Mar. 26, 2012) (unpublished). Thus, I find no error with the range.

**D**.
**The ALJ's Development of the Record**

Plaintiff's fourth issue on appeal is that the ALJ did not properly develop the record as to Plaintiff's mental impairments.  I again disagree.

For an unknown reason, the record before the ALJ did not contain the treatment records from Ms. Jimenez summarized in Part II.C, *supra*.  To be sure, it did contain Ms. Jimenez's January 2009 mental functional capacity evaluation of Plaintiff, but the ALJ gave "no weight" to her opinion therein. [AR 22 (ALJ's decision), 257-58 (Ms. Jimenez's evaluation)] The ALJ explained that he gave that opinion no weight in part because "the conclusions Ms. Jimenez purported to reach were not supported by treatment notes. In fact, the only treatment notes regarding claimant's alleged mental impairment were those of Ms. Hurley, . . ." [AR 22]

"The ALJ has a basic obligation in every social security case to ensure that an adequate record is developed during the disability hearing consistent with the issues raised." *Henrie v. U.S. Dep't of Health & Human Servs.*, 13 F.3d 359, 360-61 (10th Cir. 1993); *see also Carter v. Chater*, 73 F.3d 1019, 1022 (10th Cir. 1996) ("An ALJ has the duty to develop the record by obtaining pertinent, available medical records which come to his attention during the course of the hearing."). "The duty is one of inquiry, ensuring that the ALJ is informed about facts relevant to his decision and [learns] the claimant's own version of those facts." *Henrie*, 13 F.3d at 361. Further, 20 C.F.R. § 404.1512(e) provides that "[w]hen the evidence [the agency] receive[s] from [a claimant's] treating physician or psychologist or other medical source is inadequate for [the agency] to determine whether [the claimant is] disabled, [the agency] will need additional information to reach a determination or a decision." *Cowan v. Astrue*, 552 F.3d 1182, 1187 (10th Cir. 2007).

Here, there was no need to further develop the record because sufficient information existed for the ALJ to make his determinations that Plaintiff's depression was not severe and that Plaintiff was not disabled as a result thereof. *See id.* (concluding that there was no need for the ALJ to further develop the record concerning a claimant's mental impairment because the ALJ had sufficient information to make her disability determination). While Plaintiff asserted depression as a basis for his disability, the limitations he alleged were all physical and did not derive from or relate to his depression. [AR 19, 141-42] There was also evidence that Plaintiff left his employment in late 2007 because he was unable to "stand or perform the *physical* duties required on the job." [AR 19, 142 (emphasis added)] The record further demonstrates Plaintiff's ability to concentrate and socialize adequately.[*See* AR 31-40, 149-58] Additionally, there are the opinions from Drs. Wanstrath and Martinez, who found that Plaintiff's depression caused only mild restrictions in activities of daily

20

living, social functioning, and concentration, no episodes of decompensation, and who concluded

that Plaintiff did not have a "severe" mental impairment as defined by the Act.[AR 209-223, 229-30]

      Additionally, Plaintiff was represented by counsel at the hearing before the ALJ (though not

his current counsel). In *Hawkins v. Chater*, the Tenth Circuit held that

> when the claimant is represented by counsel at the administrative hearing, the ALJ
> should ordinarily be entitled to rely on the claimant's counsel to structure and present
> claimant's case in a way that the claimant's claims are adequately explored. Thus, in
> a counseled case, the ALJ may ordinarily require counsel to identify the issue or
> issues requiring further development. *See Glass v. Shalala*, 43 F.3d 1392, 1394-96
> (10th Cir. 1994) (refusing to remand for further development of the record where the
> ALJ had carefully explored the applicant's claims and where counsel representing
> claimant failed to specify the additional information sought).

113 F.3d 1162, 1167-69 (10th Cir. 1997); *see also Maes v. Astrue*, 522 F.3d 1093, 1096 (10th Cir.

2008).  Plaintiff's counsel at the hearing did not request that any record be added or obtained or for

further development of the record.[*See* AR 29-44] Indeed, when asked whether he had any

supplements or amendments to the medical exhibit file, he replied "no." [AR 31] This weighs

against finding that the ALJ failed to properly develop the record. *See Cowan*, 552 F.3d at 1188.

      Moreover, even if the ALJ did fail to properly develop the record by not ordering Ms.

Jimenez's records, that does not compel reversal here. Plaintiff submitted those records to the

Appeals Council with his request for review of the ALJ's decision. [AR 5] As discussed *infra*, the

Appeals Council considered those records and did not err in concluding that they did not provide

a basis for changing the ALJ's decision. *See* Part VI.E, *infra*. The issue of whether the ALJ should

have obtained those records is thus moot, as they were incorporated into the record and considered

by Appeals Council.  [AR 5] Furthermore, in light of the fact that the Appeal Council's incorporated

and considered the records, and that its conclusion that the records did not provide a basis for

changing the ALJ's decision was not erroneous, Plaintiff fails to meet his burden of showing that

the ALJ's failure to obtain the records affected the ultimate outcome of the case or otherwise harmed him. *See Shineski v. Sanders*, 556 U.S. 396, 409 ("[T]he burden of showing than an error is harmful normally falls upon the party attacking the agency's determination."); *O'Dell v. Shalala*, 44 F.3d 855, 859 (10th Cir. 1994) ("[B]ecause the Secretary's decision does not become final until after the Appeals Council denies review or issues its own findings, her 'final decision' necessarily includes the Appeals Council's conclusion that the ALJ's findings remained correct despite the new evidence."). And a harmless error does not warrant reversal. *See, e.g., Ren*, 2009 WL 3497785, *6.

Accordingly,  I reject this claim of error.

### E.
### Appeals Council's Consideration of the Additional Records from Ms. Jimenez

Plaintiff's next issue is that the Appeals Council improperly assessed the additional treatment records from Ms. Jimenez that he submitted as new evidence during the pendency of its review. [AR 260-80]; *see* Part II.C, *supra*.  This argument is meritless.

A claimant may submit new evidence to the Appeals Council. *See* 20 C.F.R. § 404.900(b). Pursuant to 20 C.F.R. § 404.970(b), " 'new evidence [submitted to the Appeals Council] becomes part of the administrative record to be considered when evaluating the Secretary's decision to substantial evidence.' " *Threet v. Barnhart*, 353 F.3d 1185, 1191 (10th Cir. 2003) (quoting *O'Dell*, 44 F.3d at 859). That regulation "specifically requires the Appeals Council to consider evidence submitted with a request for review 'if the additional evidence is (a) new, (b) material, and (c) relate[d] to the period on or before the date of the ALJ's decision.' " *Id.* (quoting *Box v. Shalala*, 52 F.3d 168, 171 (8th Cir. 1995)). "If the Appeals Council fails to consider qualifying new evidence, the case should be remanded for further proceedings."  *Id.*

Plaintiff first argues that the Appeals Council did not consider the additional records from Ms. Jimenez. This is simply false. In reviewing Plaintiff's appeal, the Appeals Council stated it "considered the reasons [Plaintiff] disagree[s] with the decision and the additional evidence listed on the enclosed Order of Appeals Council." [AR 1] The "additional evidence" included the additional records from Ms. Jimenez. [*See* AR 4, 5, 260-80] The Appeals Council concluded, however, that "this information does not provide a basis for changing the [ALJ's] decision." [AR 2] As a result, I conclude that the Appeals Council adequately considered the records from Ms. Jimenez. *See Martinez v. Barnhart*, 444 F.3d 1201, 1207 (10th Cir. 2006) (concluding that even though the Appeals Council did not specifically discuss certain treatment records that the claimant had submitted as additional evidence, it adequately demonstrated consideration of those records by stating that it had "considered . . . the additional evidence identified on the attached Order of the Appeals Council," which described the treatment records at issue, and that "neither the contentions nor the additional evidence provide a basis for changing the Administrative Law Judge's decision"); *see also Hackett v. Barnhart*, 395 F.3d 1168, 1172-73 (10th Cir. 2005) ("Plaintiff complains that the Appeals Council's reference to the state proceeding was perfunctory—the Appeals Council wrote only that it had considered the additional evidence submitted 'but concluded that neither the contentions nor the additional evidence provides a basis for changing the Administrative Law Judge's decision.' Yet, our general practice, which we see no reason to depart from here, is to take a lower tribunal at its word when it declares that it has considered a matter. We reject this claim of error.") (internal citations omitted).

Plaintiff secondly contends that the Appeals Council should have specifically discussed the additional records from Ms. Jimenez. While this would have been helpful upon judicial review,

Plaintiff points to nothing in the statutes or regulations that would require such an analysis in this situation. I thus reject this contention. *Martinez*, 444 F.3d at 1208; *Hackett*, 395 F.3d at1172-73.

It is opaque whether Plaintiff's arguments with respect to this issue go beyond those presented above. Most notably, it is unclear whether he argues that the additional records from Ms. Jimenez should have led the Appeals Council to overturn the ALJ's decision. Nevertheless, because the Appeals Council "considered" the additional records from Ms. Jimenez, the records are a "part of the administrative record to be considered [by the court' when evaluating the ALJ's decision for substantial evidence." *O'Dell*, 44 F.3d 859. I must therefore consider the entire record, including those Ms. Jimenez's additional records, to determine whether the evidence requires a change in outcome. *See, e.g., Hardman v. Barnhart*, 362 F.3d 676, 681 (10th Cir. 2004) ("We cannot agree with the Appeals Council's statement that the MRI evidence does not provide a basis for changing the ALJ's decision."); *O'Dell*, 44 F.3d at 859 ("Here, consideration of the new evidence does not require a change in the outcome: the ALJ's determination remains supported by substantial evidence.").

Having done so, I conclude it does not. In fact, the records from Ms. Jimenez buttress the ALJ's determinations. Her notes reflect that Plaintiff's depression did not significantly affect his ability to perform basic work activities. On multiple occasions, the notes indicate that while Plaintiff's mood was depressed, his appearance, behavior, and cognition were normal; [*See, e.g.*, AR 277, 279] They further indicate that Plaintiff was functioning well and managing things well at home [AR 270, 271] They show that he was taking care of his grandchildren, traveling with his wife, intending to do radio broadcasting work, and was doing some projects around his in-law's home, including some painting. [AR 263-64] The records also evince that Plaintiff felt well to quite well

over the course of many months. [AR 263, 266-70, 272, 273] This suggests that Plaintiff's depression fails to meet the duration requirement of an impairment.  *See* 20 C.F.R. § 404.1509 ("Unless your impairment is expected to result in death, it must have lasted or must be expected to last for a continuous period of at least 12 months. We call this the duration requirement."); Social Security Ruling 82-53 ("Denial for insufficient duration is applicable in all cases in which: (1) The impairment(s) was or is of such severity that the claimant was or is unable to engage in any [substantial gainful activity] (or any gainful activity); but (2) By the end of 12 months, the impairment is, or will be, no longer of such severity as to prevent [substantial gainful activity]."). The record reflects that Plaintiff first complained of depression in August 2008. [AR 189-90] Yet Ms. Jimenez's records state that in January 2009 that Plaintiff was "feeling pretty good" [AR 272]; in March 2009 he was "feeling very good about himself" [AR 269]; and in May 2009 he was doing "very, very well" and did not feel depressed. [AR 266] Moreover, the evidence I discussed in Part VI.D, *supra*, which supported the ALJ's determinations, was also before the Appeals Council. These additional records from Ms. Jimenez would thus not have altered the ALJ's determinations. I therefore find no error here.

### F.
### Appeals Council's Consideration of the Additional Record from Ms. Hurley

Plaintiff's penultimate issue is similar to the one just discussed. He argues that the Appeals Council improperly assessed the additional records from Ms. Hurley that he submitted as new evidence to the Appeals Council during the pendency of its review. [AR 281-82]; *see* Part II.C, *supra*.  This argument is likewise meritless.

As discussed, the Appeals Council stated that "[it] considered . . the additional evidence listed on the enclosed Order of Appeals Council." [AR 1] The additional record from Ms. Hurley

was listed.  [AR 4, 5] The Appeals Council then explained that

> this new evidence includes a statement from Kristen Hurley, Physician Assistant, that you can only be on your feet for one half hour in an eight hour work day. This opinion, dated after the hearing decision, is from a non-medical source and does not refer to any significant medical findings to support the degree of limitation. We found that this information does not provide a basis for changing the [ALJ's] decision.

[AR 1-2].

As Defendant concedes, the Appeals Council incorrectly stated that Ms. Hurley was a non-medical source. This error does not compel reversal because the Appeals Council nevertheless provided other reasons for concluding that the opinion did not provide a basis for changing the ALJ's decision. One was that the opinion does not refer to any significant medical findings. [AR 281] A treating source's opinion may be rejected if it is brief, conclusory, and unsupported by medical evidence. *Frey*, 816 F.2d at 513. This opinion is all three. [*See* AR 281] The opinion itself does not provide any support or explanation for its conclusion that Plaintiff can be on his feet for only 30 minutes in an eight hour workday.[AR 281] Furthermore, while Ms. Hurley's records before the ALJ certainly indicated that Plaintiff had pain in his knees and that he has discernible osteoarthritis, her records do not support the opinion that Plaintiff can only be on his feet for 30 minutes.  To the contrary, they show that Ms Hurley prescribed over-the-counter medication for Plaintiff's pain relief, and she encouraged Plaintiff to walk and work. [*See, e.g.*, AR 239, 247] It is also worth stating that the ALJ had Ms. Hurley's records before him when he rendered his decision.

Moreover, there is also substantial evidence supporting the ALJ's decision that Plaintiff could be on his feet for much more than 30 minutes per eight-hour workday.  Among others, Ms. Fonseca's physical examination of Plaintiff revealed no swelling or bruising in his knees, no signs of acute effusion,"well-preserved" range of motion in both knees, a normal station and gait, and

stability in both knees in response to stress tests. [AR 191] Mr. Robbins's review of the record led

him to conclude that Plaintiff could stand and/or walk for about six hours and sit for about six hours

in an eight-hour workday. [AR 201-08] Dr. Steinhardt agreed. [AR 227-28] Plaintiff also sought only

periodic treatment, and he chose not to pursue treatment. He continued living a relatively normal

life, which included, *inter alia*, driving, shopping, cleaning, mowing the lawn, and traveling.

Because the ALJ's decision remains supported by substantial evidence, the additional opinion does

not require a change in outcome. *See O'Dell*, 44 F.3d at 859.

For these reasons I find no error with the Appeals Council's treatment of the additional

record from Ms. Hurley.

## G.
### Assessment of Plaintiff's Credibility

Plaintiff's seventh and final issue is that the ALJ applied the wrong legal standard for

assessing his credibility. I disagree.

An ALJ must engage in two-step inquiry for evaluating a claimant's reported symptoms. *See*

20 C.F.R. § 404.1529; Social Security Ruling 96-7p, 1996 WL 374186, *2 ("SSR 96-7p"). The ALJ

firstly "must consider whether there is an underlying medically determinable physical or mental

impairment(s)--i.e., an impairment(s) that can be shown by medically acceptable clinical and

laboratory diagnostic techniques--that could reasonably be expected to produce the individual's pain

or other symptoms." SSR 96-7p, 1996 WL 374186, at *2. If there is, the ALJ secondly "must

evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine

the extent to which the symptoms limit the individual's ability to do basic work activities." *Id.* In

doing so, "whenever the individual's statements about the intensity, persistence, or functionally

limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the

adjudicator must make a finding on the credibility of the individual's statements based on a consideration of the entire case record." *Id.*

"Credibility determinations are peculiarly the province of the finder of fact, and [I] will not upset such determinations when supported by substantial evidence." *Diaz v. Sec'y of Health & Human Serve.*, 898 F.2d 774, 777 (10th Cir. 1990). An "ALJ's credibility findings warrant particular deference." *White*, 287 F.3d at 910. This is because an ALJ "see[s] far more security cases than do appellate judges" and because "he or she is uniquely able to observe the demeanor and gauge the physical abilities of the claimant in a direct and unmediated fashion." *Id.* For these reasons, courts will "generally treat credibility determinations made by an ALJ as binding upon review." *Gossett v. Bowen*, 862 F.2d 802, 807 (10th Cir. 1988).

Nevertheless, credibility findings "should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings." *Huston v. Bowen*, 838 F.2d 1125, 1133 (10th Cir. 1988). The reasons for the finding "must be grounded in the evidence and articulated in the determination or decision." SSR 96-7p, 1996 WL 374186, *4. "The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record." *Id.* A credibility determination, however, "does not require a formalistic factor-by-factor recitation of the evidence. So long as the ALJ sets forth the specific evidence he relies on in evaluating the claimant's credibility, the dictates of *Kepler* [*v. Chater*, 68 F.3d 387, 391 (10th Cir. 1995)] are satisfied." *Qualls*, 206 F.3d at 1372.

The ALJ followed these dictates. He explicitly set forth and applied the two-step inquiry delineated above. [AR 20-21] He initially found that Plaintiff had a medically determinable impairment that could reasonably be expected to cause the alleged symptoms. [AR 21] He then

28

concluded, however, that "after careful consideration of the evidence, . . . [Plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms were not credible to the extent that they were inconsistent with the above [RFC] assessment." [AR 21] The ALJ presented the medical evidence and the specific reasons that led to his conclusion as to Plaintiff's credibility. [AR 21-22] He considered that Plaintiff did not seek treatment for his knee pain until well over one year after his alleged onset date and that he sought only periodic treatment [AR 21-22]; *see Bean v. Chater*, 77 F.3d 1210, 1213 (10th Cir. 1995) (ALJ reasonably considered the claimant's failure to seek treatment for four months after an alleged injury). He considered that Plaintiff chose not to pursue treatment and therapy for his knee problems and that he failed to schedule follow-up appointments. [AR 22] He noted that Ms. Hurley prescribed over-the-counter medication for pain and that Plaintiff was continually urged to walk. [AR 21-22]; *see Bean*, 77 F.3d at 1213 (concluding that ALJ properly considered a claimant's use of medications). The ALJ further found that Plaintiff's allegations were incongruent with the fact that he lived a relatively normal life, which involved living with his daughter, watching his grandchildren, driving, shopping, cleaning, mowing the lawn, and interacting with his family on a regular basis. [AR 22]; *see Bean*, 77 F.3d at 1213 (concluding that ALJ properly considered a claimant's daily activities). Additionally, the ALJ considered that Plaintiff testified that he used a cane but that no medical records indicated he used or needed one and that he was repeatedly encouraged to walk. [AR 22] The ALJ also found that Plaintiff's allegations of disabling pain were inconsistent with the objective medical evidence–such as Ms. Fonseca's exam records and Ms. Hurley's finding that Plaintiff's osteoarthritis was mild to moderate. [AR 21-22]; *see Huston*, 838 F.2d at 1132 (in assessing credibility, an ALJ may consider the "consistency or compatibility of nonmedical testimony with objective medical evidence"). All

of these considerations are supported by evidence of record. The ALJ thus clearly satisfied the requirements for credibility determinations. I therefore reject Plaintiff's argument that the ALJ used the wrong legal standard when assessing his credibility.

Plaintiff also essentially argues that the ALJ failed to explain which parts of his testimony and allegations he found credible and which he did not. He asserts the credibility determination is conclusory and boilerplate. This is simply untrue. The ALJ stated that he found Plaintiff's statements concerning his symptoms not credible to the extent that they were inconsistent with the RFC assessment; he thus found those statements that were consistent credible. This is clear to me. My discussion above also shows that the credibility finding was far from conclusory.

## VII. CONCLUSION

For the foregoing reasons, I AFFIRM the Commissioner's final order.

Dated: February   20  , 2013, in Denver, Colorado.

BY THE COURT:

  s/Lewis T. Babcock                
LEWIS T. BABCOCK, JUDGE
